Page 1

1              IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
2                        SOUTHERN DIVISION

3

   LYNDON PROPERTY INSURANCE
4  COMPANY,

5          Plaintiff,

6  V.                      CIVIL ACTION NO.: 1:03CV310GR

7  DUKE LEVY & ASSOCIATES, P.A.,

8          Defendants.

9

10

11

                    DEPOSITION OF ROY D. GLENN
12

           Taken at the offices of Glenn Engineering,
13         Inc., located at 407 West Oak Street,
           Laurel, Mississippi, on Tuesday, March 22,
14         2005, beginning at 10:14 a.m.

15

16

17

   REPORTED BY:
18

        Sandi L. Suarez, RPR, CSR 1301
19      State-Wide Reporters
        4400 Old Canton Road, Suite 300
20      Post Office Box 14113 (39236)
        Jackson, Mississippi  39211
21      Telephone:  (601) 366-9676
        Fax:  (601) 366-9756
22

        Coast Address:
23

        764 Water Street (39530)
24      Post Office Box 389
        Biloxi, Mississippi 39533
25      Telephone:  (228)  432-0770

EXHIBIT

A

Page 10

1    under the same name?

2        A.   No.   No, it started out as the Glenn

3    Company.   It was an unincorporated business.   And I

4    think in 1994 it was incorporated as Glenn

5    Engineering.

6        Q.   And it's operated in that form since that

7    time?

8        A.   Yes.

9        Q.   Mr. Glenn, tell me about your experience

10   either designing or managing the construction of or

11   doing any engineering work with -- and that's broad,

12   so, I guess just looking for any of your experience

13   involving pressurized sewer systems.

14       A.   Very little in pressurized sewer systems.

15   But my work has been involved in closed system

16   hydraulics for a long, long time.   Water systems are

17   a similar type of system.   And that's a closed

18   system hydraulics program.   So is pressure sewers.

19   The only -- the only difference between a pressure

20   sewer and a water system or water -- water project

21   is that a water project is a multidemand system;

22   whereas, a pressure sewer is a multipressure point

23   system.

24            In other words, there's -- there's

25   pressures that come in from it to it from a lot of

Page 11

1    different places.  Every pump station adds to the

2    pressure of the system; whereas, in the water system

3    you have single pressure points and multiple demand

4    points.  But the mathematics are all the same.  The

5    pipe -- the pipe characteristics are the same.  So,

6    there's -- there's really no difference in them.

7        Q.   And is it fair to say -- and I don't want

8    to ask you a bunch of questions that are

9    unnecessary -- that in your experience as an

10   engineer you have not managed the construction of or

11   engineered a pressure sewer system?

12       A.   Small systems, but not big systems like

13   Duke has been managing, just small systems.

14       Q.   Okay.

15       A.   That has --

16       Q.   Can you give me some examples of those?

17       A.   Well, we're designing one right now in

18   Hattiesburg.  We have done some work with small

19   developments where pressure sewers were required but

20   no more than ten or 15 units at a time.  This --

21   this particular project was much, much larger than

22   that.  So I've never imagined a sewer project that

23   big.

24            But water systems, water system projects

25   have gone up to eight and nine million.  So, if

1   their primary responsibility, see to it that the

2   material that is placed in -- in position is the

3   material that's been specified.  It's at the right

4   depth or right height or whatever the case may be.

5   And that's it.  They don't have any more

6   responsibility.  They do not supervise the

7   contractor.

8       Q.   On Page 4, under heading B, The

9   Irresponsibility of Lyndon Property Insurance

10  Company.

11      A.   Uh-huh (indicating affirmative).

12      Q.   First, I'd like to ask you a few questions

13  about your background and experiences.  Do you have

14  any training as a bond or surety underwriter?

15      A.   No, sir.

16      Q.   Have you had any education in that field?

17      A.   No.

18      Q.   And have you ever underwritten a bond?

19      A.   No.  Not in the business.

20      Q.   Okay.  There is -- are there any

21  publications or reference materials or resources

22  that you've relied upon in reaching your conclusions

23  in Section B?

24      A.   Just experience.

25      Q.   In the second paragraph under heading B,

Page 111

1          A.    Right.

2          Q.    -- which were for your services in this

3     case.

4                (Exhibit Nos. 6 and 7 were marked.)

5     BY MR. ANDERSON:

6          Q.    On either of these invoices, were there

7     ultimately ever adjustments made to your bills?

8          A.    Yes, we did make one adjustment.

9          Q.    And what was that adjustment?

10         A.    It was $10,000.

11         Q.    And was that an increase or a reduction?

12         A.    Reduction.  And never will I do that

13    again.

14         Q.    You had mentioned earlier your work on

15    some sewer projects?

16         A.    Uh-huh (indicating affirmative).

17         Q.    And I believe those were, you said,

18    pressurized?

19         A.    Uh-huh (indicating affirmative).

20         Q.    How many linear feet of pipe were involved

21    in those projects?

22         A.    It's been 15 years ago that I did that, or

23    longer.  I don't remember.

24         Q.    Have you done any sewer projects since

25    those?

## GLENN ENGINEERING, INC.
407 WEST OAK STREET~SUITE 200
POST OFFICE BOX 205
LAUREL, MS  39441-0205

PHONE# 601-425-2973 aglenn@megagate.com FAX# 601-425-2970

February 23, 2005

Samson & Powers, PLLC
Attn: Roland Samson III
Attorney at Law
2400 - 13th St.
Gulfport, MS 39501

RE:  Lyndon Property Insurance Company V. Duke Levy & Associates, P.A.
     Civil Action No. 1:03CV310GUR

Dear Mr. Samson,

I have not authored any publications.  I have not testified as an expert witness in the last four (4) years.

Sincerely,

Roy D. Glenn P.E.
RDG/ag


EXHIBIT
2
R. Glenn
3-22-05




# GLENN ENGINEERING, INC.
407 WEST OAK STREET~SUITE 200
POST OFFICE BOX 205
LAUREL, MS 39441-0205

PHONE# 601-425-2973 aglenn@megagate.com FAX# 601-425-2970

February 23, 2005

Samson & Powers, PLLC
Attn: Roland Samson III
Attorney at Law
2400 - 13th St.
Gulfport, MS 39501

RE: Lyndon Property Insurance Company V. Duke Levy & Associates, P.A.
    Civil Action No. 1:03CV310GUR

Dear Mr. Samson,

I have reviewed all of the contract documents, specifications, plans, inspection reports, pay request forms, correspondence files, expert witness reports and the lawsuit filed by Lyndon Property Insurance Company against Mr. Duke Levy.

My comments, observations and opinions regarding Lyndon Property Insurance Company's accusations against Duke Levy are based upon my forty (40) years of practice as a graduate Engineer with twenty eight (28) years as a Registered Professional Engineer in the states of Mississippi and Alabama. My experiences as an Engineer includes work as an Aerospace Engineer with the Boeing Company in the design of the Saturn Missile which involved large ballistic missile engine and structural testing, missile guidance systems and the application of orbital mechanics.

I worked at the Lockheed - Marietta Complex in Marietta, Georgia and gained experience in aircraft design, sub-sonic aerodynamics, and fatigue analysis of structures exposed to cyclic loading.

My experience includes working at the Mississippi Department of Transportation (MDOT) as a bridge design engineer where I performed an automated structural analysis of all state owned bridges including the two (2) Mississippi River crossings in Natchez and Vicksburg. My work resulted in the first time posting of allowable weight limits for all state bridges in the state. I also worked in the roadway and bridge construction division of MDOT and managed the layout surveys and the construction of roadway projects in South Mississippi.

I established the Glenn Company in 1978 and began designing water and sewer systems. In 1994 The Glenn Company was incorporated as Glenn Engineering, Inc. and now performs design work in civil, structural, environmental, mechanical, electrical engineering and architecture.

1

My engineering experiences allow me to offer the following opinions relative to the design philosophy expressed by Duke Levy, the irresponsibility of Lyndon Property Insurance Company, the incorrect testimony of Joseph N. Asaris and the incompetent and unorganized management of Panther Utilities.

From hereafter in this report Lyndon Property Insurance Company will be referred to as the "Bonding Company" and Panther Utilities of Mississippi, Inc. as "Panther" and Duke Levy as the "Engineer".

## A.   CONDUCT OF THE ENGINEER

After a thorough examination of the plans, specifications, inspection reports, bid schedules and correspondence files generated by the engineer the design and project management philosophy of the engineer becomes readily apparent.

The Contract Documents embody standards utilized by engineers throughout the state; they comply with all laws and legal code. The standards governing the design of utilities owned and used by the public are extremely sound and the engineer wisely incorporated those standards into the project addressed by this report.

The inspection reports prepared by the engineer's inspectors were more than adequate. The typical inspection report form does not provide the space to list all of the myriad of events that take place during the construction of a large complex job such as the one referenced in this report. I am including an inspection report form approved by Rural Utility Service (RUS) which is a division of the Department of Agriculture - a federal agency. The enclosed form shows how brief inspection reports need to be. See exhibit no. 1.

The inspection reports needs to contain enough information to adequately show daily that the contractor installed certain material, the quantity of that material, the approximate location of the work and the weather conditions when the installation took place. The inspection reports prepared by the engineer's inspectors provided the data needed to assess the contractor's activities and to accurately pay the contractor for the work performed.

I have examined carefully the bid schedule designed by the engineer and I find it to be fair to the contractor as well as being sensitive to the owner's need to adhere to a defined budget. The engineer provided the contractor with more than enough information to bid accurately on the job while protecting the owner by not allowing frivolous items to add to the cost of the work.

The claim of the Bonding Company is that the engineer paid the contractor too much for the work performed. The bid schedule refutes that allegation. There were at least two (2) bidders on the north project, Panther and Hemphill. Each of these firms bid similar prices for installed pipe. I spoke with Hemphill's estimator, Mr. Ricky Eiland, and he verified what I already knew. These two (2) contractors bid the pipe as a stand alone item. The hidden cost added to the cost of pipeline installation was clean-up and pressure testing of the installed pipeline. Clean-up

cost and pressure test are very minute compared to the cost of purchasing the pipe and paying for the labor of installing the pipe. The costs of all tie-ins connections, etc., were bid by Hemphill, according to Mr. Eiland, in pay item no. 16. Hemphill Construction bid the pipe installation as a stand-alone expense including only clean-up and hydrostatic testing. Clean-up and pressure testing accounts, on the average, less than .1% of the installed pipeline cost.

Panther bid thirty seven ($37) dollars more per unit in pay item 16 than Hemphill for a total of $36,778.00. Therefore it appears that Panther bid the project similar to Hemphill but with the intent of collecting a great deal of its money from quick and easy construction items such as pipeline connections which Panther never performed and never received payment for tie-in work.

Since clean-up and pipeline testing is a very minute cost of pipeline installation it is asinine to assume the engineer paid the contractor too much for the work performed when installing only pipe.

Contractors are extremely competitive when bidding pipe installation where the quantity of pipe involved in this type of project is so large. The linear feet of pipeline installed by Panther was 264,000 linear feet or 50 miles. The total cost of pipe alone was $878,445.55 or 27% of the total project expense. The unit value of pipe bid by Panther is typical of contractors that bid pipelines of this type when tie-ins are bid as a separate bid item and in this case pay item no. 16 allowed both contractors to bid on pipe installation only.

Inspection reports reveal that Panther actually installed the pipe that Panther put into its pay requests. The engineer reconciled the quantities in the affected pay items by comparing the data in the inspection reports to the amount of material shown in the contractor's pay requests. This is the limit of the engineer's liability. If the quantities that the contractor is asking to be paid for match the quantities that the engineer has entered into the inspection report, the engineer can then inform the owner that the contractor has performed the work he has asked payment for. The engineer never tells the owner to pay the contractor or not to pay the contractor. The responsibility of making payments to the contractor belongs completely with the owner - not the engineer.

Panther performed work in several other pay items included in the bid schedule. All of the work performed was done in an approved manner acceptable to the engineer and, consequently, the owner paid for the work - not the engineer.

It is a common engineering practice for items incidental to the construction to be included in the cost of the pipe or other pay items as absorbed items in order to keep a project within the budget, however, the absorbed items that can be added as part of a bid item can be performed at low cost to the contractor. Hemphill successfully finished the same type and size project for the same owner that witnessed the failure of Panther.

After the line pressure tests have been conducted, the engineer prepares a list of all leaks to be repaired, property restoration items, valve alignment, etc. The lines that

leaked are pressure tested a second time. If no leaks occur a second inspection is performed and the contractor is given another list of work items to complete. After the completion and successful execution of the 2nd list, a final inspection occurs that includes the engineer, owner, contractor and in some instances representatives of the lender and the state/federal agencies that have an interest in the completed project.

Panther, however, failed to perform enough work to allow the engineer, Duke Levy, an opportunity to establish a list of items of work to be completed. Since the work had not progressed beyond the simple task of pipe laying neither the pressure tests nor the connections could be performed.

B.   THE IRRESPONSIBILITY OF LYNDON PROPERTY INSURANCE COMPANY

The owner has a vested interest in the decisions of surety companies that bond contractors. When the bonded contractor does work for the owner, the cost of the bond purchased by the contractor is added to the cost of the contractor's bid; hence, the cost of the bond is extracted from the pocket of the owner. When the surety provides bonds for an unproven, unorganized construction company like Panther the cost of the bond can be extremely costly and the difference between the cost of bonding an experienced contractor and the cost of bonding a contractor similar to Panther can be a large sum of wasted money. It is imperative for the owner that the surety companies properly evaluate all construction companies and refuse the sale of bonds to unqualified contractors. Lyndon Property Insurance did not act responsibly when it decided to bond Panther. When Panther was proven to be unable to finish the work the owner not only lost the revenue that would have been generated by a project finished on schedule, the owner also lost money received by the surety from Panther since Panther like, all construction companies, added the cost of the bonds to its bid price

Since the surety was determined to bond Panther in spite of all that was known about Panther prior to the owner accepting Panther's bid, it appears that the surety should be accountable to the owner for the loss of revenue from the delayed project including the cost of the bonds sold to Panther.

This project was designed to be bid and executed by a skillful and competent contractor. It is always the responsibility of the Bonding Company to certify to the owner and the engineer that all construction firms that desire to bid on large projects have met exacting criteria that include a long and successful history of similar work performed, a strong financial position, and can exhibit continuity and stability in company management. Panther obviously failed in all of these areas; however, the Bonding Company failed miserably in its role as the evaluator of qualified bidders and allowed this disaster to occur.

I have included with this report fifteen (15) exhibits fourteen (14) of which describe in detail what was public knowledge of Panther's lack of organization, lack of work history, the failure to pay corporate taxes, the failure to maintain licensed qualifiers and the list goes on. It is difficult to believe that anyone, especially a surety company, would gamble that heavily on a company like Panther that was destined to collapse.

C.    THE LACK OF QUALIFICATIONS OF PANTHER

Panther listed work performed in Mississippi as proof of its ability to perform;
however, the jobs listed were bid and constructed by Panther Construction of Florida
not Panther Utilities of Mississippi. Therefore Panther of Mississippi has absolutely
no work history. Panther of Florida was managed by Bruce Farve who was licensed
in Florida but not licensed in Mississippi.  There is no reciprocity agreement
between Mississippi and Florida; consequently, the work listed by Panther of
Mississippi appears to be completely false.  In order to make Panther of Mississippi
appear legal, Bruce Farve and Dennis Reeves took and passed the proper exams to
be licensed in Mississippi as late as May 1999; however, neither Farve nor Reeves
were working with Panther prior to the bidding of the North Bayside project.  The
Bonding Company then agreed to bond a firm that had no prior experience or work
history, made improper statements regarding its existence, possessed inadequate
equipment and skilled labor to perform the work and had to renew its corporate
charter with the state.  Under these conditions, it was allowed to purchase a bond
sold by Lyndon Insurance.

A letter from Mr. Richard A. Rula, P.E. and president of Hemphill Construction to
Alfred Smith, Chairman, Hancock County Water and Sewer District explains in
detail the overall disarray and suspicious behavior of Panther.  It is obvious that
Panther submitted a bid that was clearly a non-responsive bid and consequently a bid
that should have been rejected by the owner and the bonding company.  After being
made aware of Hemphill's allegations, the Bonding Company should have
immediately ceased doing business with Panther.  A responsible surety would have
refused to guarantee the performance of a company such as Panther but an
irresponsible company such as Lyndon ignored the warnings brought to light by
Hemphill's letter.  Hemphill's letter was dated December 17, 1999, and Panther
collected its bonds between December 17, 1999 and January 20, 2000.  The Bonding
Company had 34 calendar days to review the incompetent and suspicious behavior
of Panther and arrive at the logical and responsible decision to deny Panther the
performance and payment bonds necessary for Panther to enter into an agreement
with the owner. Hemphill's letter is included as attachment no. 2.

Then on January 25, 2000, after Panther had violated the terms of the contract by
refusing to install specified equipment (pumps), the Bonding Company issued a fax
dated January 25, 2000 reaffirming its determination to bond Panther again. Prior to
this incident, Panther was an unlicensed, legally dissolved and unorganized
company.

There exists an interesting dynamic between the surety and the owner. The owner is
legally obligated to enter into a contractual agreement with a contractor like Panther
if Panther can acquire bonding. The surety, however, is not legally required to bond
even a competent contractor. The owner, therefore, is dependent on the surety to not
only insure that the project being bid will be eventually completed but also
eliminate, by proper evaluations and good risk management, inept and incompetent
contractors such as Panther.  The owner and the project engineer endure months,
sometimes years of intense frustration and mental anguish not to mention loss of
income when a bonding company acts as irresponsibly as Lyndon Property
Insurance Company.

D.   THE EXPERT WITNESS - JOSEPH N. ASARISI

It is obvious that Mr. Asaris did not understand all that he knew about the Bayside North project and Mr. Levy's role in that project. Section 1.6, construction phase, services of the agreement describes the responsibilities of the engineer to the owner. The engineer, in my opinion, provided the owner with current and factual information that enabled the owner to properly pay the contractor. To state that the resident inspectors were not on the job, could not read specifications, were illiterate and completely incompetent and did not meet with the engineer to discuss job/contractor deficiencies indicates to me that Asarisi did not see the inspection reports, does not understand the significance of as-built drawings and how the data is gathered that generates as-built drawings.

Asarisi cites that the Bonding Company paid out $770,600 to finish the work and $952, 638 to repair work that had already been completed. I don't see any evidence in the legal documents I received to substantiate that any repair work was performed. I do know that contractors that are employed by bonding companies to finalize unfinished work left by incompetent contractors charge much more for their time and materials than was originally bid. Instead of paying for repair work (repair of what?) the Bonding Company paid another contractor for work that had already been executed simply because the last contractor was given a blank check. Since the Bonding Company's contractor had to assume the liability of Panther's unfinished work it is easy to conclude that the Bonding Company paid the final contractor for that liability.

As I have stated earlier in this report, it is my opinion, after discussing the bidding process with Panther's competitor, Hemphill Construction, that both contractors included all tie-in costs under pay item no 16. Testing and clean up costs were included in the installation of the pipe.

Panther never progressed to testing the pipe; however paying Panther for the pipe installed is completely legitimate for this type of utility project since testing is such a minute cost of pipeline installation.

The contract makes ample provision to protect the owner since 10% of each pay request is subtracted from the contractor's submitted amount to provide the owner with ample funds to pay for items not completed should the contractor fail to finish the project. If Panther had been able to finish the work as bid it would have contributed $328,058.97 to the retainage account. This amount of retainage would more than pay for all items of work Panther might have missed.

The statements made by Mr. Asarisi are accusations without facts and as such are totally useless. Mr. Levy and his inspectors managed the construction phase of this project in a professional and legal manner, and the claim that the contractor was paid for work that was not performed or installed improperly cannot be verified.

SUMMARY OF MY FINDINGS

There is no doubt in my mind that Panther Utilities of Mississippi was completely incapable of finishing the North Bayside project. Panther bid illegally on the work, the corporate structure was in dissolution and the license holder was non-existent.

The Bonding Company was far more irresponsible than the contractor. It put an unreasonable burden on the owner (HCWSD) and cost the owner income by contributing to a long delay in completion of the North Bayside project. The project engineer lost income by having his time consumed by having to address problems and issues that were not of his making and for which he will never be compensated for.

The project engineer did his job well, after preparing an excellent design he attempted to prevent the disaster that occurred with Panther by communicating with the owner and the surety that Panther was acting irrationally. His warnings were dismissed and ignored. During the partial construction of this project, the engineer made sure that Panther was paid for the work performed and nothing more. In my opinion he approved for the owner exactly what Panther installed and, consequently, insulated the owner from a breach of contract claim by Panther Utilities of Mississippi.

Sincerely,

Roy D. Glenn, P.E.
RDG/ag

- 7 -