IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

LYNDON PROPERTY INSURANCE COMPANY                                    PLAINTIFF

VERSUS                                    CIVIL ACTION NO.: 1:03-CV-00310-LG-RHW

DUKE LEVY & ASSOCIATES, P.A.                                           DEFENDANT

## MEMORANDUM OF AUTHORITIES IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### BACKGROUND

On or about January 17, 2000, Hancock County Water & Sewer District ("Hancock

County"), owner, and Panther Utilities of Mississippi, Inc. ("Panther"), contractor, entered into a

contract for the construction of a sewerage collection system for Harbor Drive Area, Bayside

Park Subdivision, Lakeshore Community and Highway 90 West in Hancock County, Mississippi.

This project was generally known as the Low Pressure Sewer System, Project North.  Hemphill

Construction Co., Inc. constructed the sister project, Low Pressure Sewer System, Project South.

The engineer of record for the subject project (and Project South) was Duke Levy &

Associates, P.A. ("DLA"), which prepared the plans and specifications.  The contract provided

for substantial completion and final completion on October 12, 2000, and November 11, 2000,

respectively.

Panther submitted a bid dated November 19, 1999, in the amount of $3,280,589.71.

Panther received a Notice of Award dated December 21, 1999.  Panther received a Notice to

Proceed dated January 6, 2000.  Panther obtained performance and payment bonds through

Cumberland Surety Insurance Company, Inc. ("Cumberland")/Lyndon Property Insurance

Company ("Lyndon") in the amount of $3,280,589.71.[1]

On October 13, 2000, J.P. Compretta, counsel for Hancock County, wrote Panther stating:

> As you know, your contract with the Hancock County Water & Sewer District ("the District") provides that all work under your contract will be substantially complete on or before October 12, 2000, and that your work will be finally complete on or before November 11, 2000.  The District has been notified by its Engineer that your company has not achieve substantial completion by October 12, 2000, nor demonstrated an ability to achieve final completion by November 11, 2000.  This failure is a material breach of your contract which would justify termination for default pursuant to Article 15.2.6.
>
> The District, at it monthly meeting on October 12, 2000, adopted a motion to give Panther . . . the opportunity to comply with the provisions of the contract.  Please consider this your formal written notice that unless your company, within seven days of this notice, demonstrates an ability to achieve final completion of your contract on or before November 11, 2000, your contract will be terminated pursuant to Article 15.2 of the contract.
>
> The District has received a letter from your company dated September 21, 2000, which makes general, unsupported allegations that you are entitled to a time extension on the project.  The District is willing to review any documentation you have on this issue.  If your company believes it is entitled to a time extension pursuant to Article 12 of the contract, please submit all such requests with full supporting documentation to the Engineer and the District in order for your request to be considered within the seven day period referenced above.

On or about October 24, 2000, Compretta notified Panther that it had been terminated and confirmed that Panther's surety, Lyndon, agreed to complete Project North in accordance with its performance bond.  Thereafter, DLA met with Lyndon and its representatives on numerous occasions and provided Lyndon with "as-built" drawings to be used to bid the completion of Project North.  Lyndon obtained bids for completion of the project, and the contract was awarded to and completed by Cooley Contracting, Inc.

---

[1]Because Cumberland had a rating of B-, it had to partner with Lyndon to jointly write the bonds.

<u>LEGAL ANALYSIS</u>

After citing several contractual provisions addressing the relationship and authority among DLA, Hancock County and Panther (Complaint, pp. 2-4, Exh. A), Lyndon's Complaint alleges that DLA breached its duty to exercise ordinary professional skill and diligence in performing its duties under the contract and related to Project North.  (<u>Id.</u>, p. 4, ¶ 16). Particularly, Lyndon asserts that DLA approved applications for progress payments when it knew or should have known that the work performed by Panther had not progressed to the point indicated and/or that the quality of the work was not in accordance with the contract documents. (<u>Id.</u>, p. 4, ¶ 16).

Additionally, Lyndon alleges that DLA breach its duty of care in performing inspection services for Project North, and that DLA failed to either reject Panther's deficient work or to withhold payment for the deficient work.  (Lyndon's Resp. to Inter. No. 6, Exh. E).  As a result, Lyndon was injured when it was forced to correct Panther's deficient work and was deprived of additional funds which should have been withheld from Panther by DLA.  (<u>Id.</u>)

Lyndon's Complaint concludes that it is "entitled to indemnity from Duke Levy for all amounts that Lyndon was required to pay as indemnity on the bond due to Duke Levy's breach of contract, breach of warranty and negligence."  (Complaint, p. 5, ¶ 21, Exh. A).  Lyndon seeks "compensation for damages it allegedly incurred for corrective work to repair work that had been inspected and approved by [DLA] and which [DLA] recommended for payment" totaling $807,936.  (Lyndon's Resp. to Inter. No. 9, Exh. E).

A review of the Complaint and Lyndon's Responses to discovery clearly reveals that Lyndon is pursuing claims against DLA under a theory of negligence.  Although Lyndon relies upon contractual provisions in its Complaint and alleges that DLA breached its contract, no

3

claim is made by Lyndon that it is a third-party beneficiary to any contract.  This Memorandum

of Authorities will address two points: 1) Lyndon cannot prove the elements of negligence; and

2) the economic loss rule bars Lyndon's negligence claims.

      I.     NEGLIGENCE

To prove negligence, Lyndon must show by a preponderance of the evidence (1) duty, (2)

breach, (3) causation, and (4) injury.  <u>Gulledge v. Shaw</u>, 880 So. 2d 288, 292-93 (Miss. 2004).

DLA will address each element of negligence in turn and prove that Lyndon can satisfy none of

these elements.

      A.     <u>Duty</u>

DLA does not owe a duty to Lyndon.  According to the Mississippi Supreme Court, duty

is an issue of law to be decided by the courts because it is the courts that engage in

"consideration of the policy matters and the precedent which define the concept of duty."  <u>Rein v.</u>

<u>Benchmark Constr. Co.</u>, 865 So. 2d 1134, 1143 (Miss. 2004).  Therefore, both policy and

precedent must weigh in favor of imposing a duty on DLA under the facts of this case.  Notably,

duty is determined on a case-by-case basis, thus the context of the dispute predominates

consideration in light of applicable legal principles. <u>Heber E. Costello, Inc. v. Edwards and Son,</u>

<u>Inc.</u>, No. 2:96CV42-B-B, 1998 WL 94925 (N.D. Miss. Jan. 22, 1998).

      1.     <u>Policy Factors</u>

Commenting on the law in Mississippi, the Fifth Circuit noted the policy factors that

must be considered when determining whether a duty exists in a given case:

> The policy factors which must be considered in determining whether a duty exists
> have been judicially defined as follows: the foreseeability of harm, the degree or
> certainty of injury, the closeness of the connection between the defendant's conduct
> and the injury suffered, the moral blame attached to the defendant's conduct, the
> policy of preventing future harm, the extent of the burden to the defendant and

consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, costs, and prevalence of insurance for risk involved.

Deramus v. Jackson Nat'l Life Ins. Co., 92 F.3d 274, 282 n. 8 (5th Cir. 1996) (quoting Foster v. Bass, 575 So. 2d 967, 979 (Miss. 1990) (citation omitted)).  Underlying and impacting the entire determination of duty in this context is the traditional and well-established distinction between tort and contract.  Duties deriving from tort have long-protected and provided remedies to those whose life, limb or property have been damaged, while recovery for purely economic loss has been left to contract.  More importantly, contract has long-allowed parties to define their relationships, duties, obligations, authority, exposure and remedies.  Lyndon actively seeks to erode and reform the distinction between tort and contract for its own benefit, expanding the reach of tort for its own purposes at the expense of contract.

In the present context, the purely economic loss to Lyndon was not reasonably foreseeable by DLA.  Regarding foreseeability, "the inquiry is not whether the thing is to be foreseen or anticipated as one which will probably happen, but whether it is likely to happen, even though the likelihood may not be sufficient to amount to a comparative probability."  Rein, 865 So. 2d at 1145 (quoting Gulf Ref. Co. v. Williams, 185 So. 234, 236 (Miss. 1938)).  Stated in context, the question is whether DLA could reasonably foresee that failure to require Panther to repair its deficient work and/or to withhold payment from Panther could likely lead to economic loss to Lyndon.  See Rein, 865 So. 2d at 1146.

Assuming that DLA did not require or instruct Panther to repair any of its deficient work and that DLA did not withhold payment for deficient work performed, the inquiry begins as whether there is a likely injury and to whom.  Simply put, there is no likely or foreseeable injury under the facts of this case for two reasons.  First, Panther was responsible for repairing any

5

deficient work at no cost to Hancock County, or any other entity.  Under the contracts, Panther bore sole cost and responsibility for the quality of its work.  (General Conditions, Exh. C). Therefore, whether DLA required Panther to correct its deficient work or withheld payment for deficient work is irrelevant because Panther would eventually be forced to correct its deficient work, so long as Panther remained to complete the project.

Second, DLA withheld a 10% retainage from every payment made to Panther for the purpose of providing an incentive to Panther to correct its deficient work and for testing of the system at which time deficient work could easily be discovered and Panther held accountable for repairs.  Therefore, as long as Panther was on the project, it could be held accountable for the quality of its work and the costs of repairs. Consequently, it was not foreseeable that any injury would result from DLA's alleged negligent conduct.  Particularly, it was not foreseeable that Lyndon would incur any economic loss due to DLA's actions so long as Panther did not default on its contract with Hancock County.

Undisputably, in order for Lyndon to face any potential economic loss, Lyndon would have to be called upon by Hancock County to fulfill its obligation under the performance bond. (Construction Performance Bond, Exh. B).  It is equally unquestionable that the only reason for Lyndon to be called upon to perform would be if Panther, as Lyndon's insured, were held in default on its contract with Hancock County.  Therefore, DLA could only reasonably foresee economic loss to Lyndon if DLA could reasonably foresee that Panther would default on its contract with Hancock County.  When asked at his deposition whether it was foreseeable that Panther would default, Lyndon's engineering expert, Joseph Asarisi, testified that it was not foreseeable.  (Depo of Joseph Asarisi, p. 167, Exh. F).  Additionally, when asked at what point it would be foreseeable that Panther would default, Mr. Asarisi testified that, "I don't know that you

6

would know that they [Panther] would default."  (Id.)

The irony of the present facts cannot be understated.  By virtue of the instant suit, DLA must now point out that it could not reasonably foresee Panther's default in order to show that DLA could not reasonably foresee economic loss to Lyndon.  Here is the irony: Lyndon bonded Panther and in doing so, was in the best position to determine whether and to what extent Panther would be able to fulfill its obligations under the contract with Hancock County.  Lyndon stood in the best position to avoid any loss to itself by adequately investigating and ultimately, not bonding Panther.  Moreover, Lyndon was paid a premium by Panther to assume the risk of Panther defaulting.  Surely, Lyndon would not bond a contractor that it reasonably believed would default.  As testified in Lyndon's 30(b)(6) deposition, "the bottom line is, you don't expect to ever have a loss when you write a bond," and Lyndon would "never anticipate a loss when you write a bond."  (Lyndon 30(b)(6) Depo., pp. 43-44, Exh. G).  From Lyndon's perspective, "[y]ou don't write the bond if you think there is going to be a loss at all."  (Id. at 44).

What a cruel twist of fate that DLA is now having to promote the notion that Panther's default was not reasonably foreseeable in defense of a claim brought by Lyndon based on a contrary notion, when it was Lyndon, in the first instance, that failed to foresee Panther's default.  DLA's alleged failures were only relevant to Lyndon once Panther defaulted.  Simply put, DLA could not have reasonably foreseen Panther's default; and therefore, DLA could not have reasonably foreseen economic loss to Lyndon, allegedly occasioned by DLA's failure to force Panther to correct its deficient work and/or withhold payment.  Clearly, the policy factor of foreseeability of harm weighs in favor of DLA.

The degree or certainty of injury also favors DLA.  Particularly, the injury suffered is a purely economic loss, foreign to the tort arena.  Notably, the economic loss was one for which

Lyndon assumed the risk and was paid a premium therefore.  Lyndon, as a bonding company, is

in the business of assuming risk and loss, offering assurance to owners that a contract will be

completed.  Moreover, a portion of Lyndon's loss was re-insured in this matter by its agent,

Cumberland.  Additionally, Lyndon's injury is uncertain.  While Lyndon may claim that it paid

$807,936 in total repair costs, it remains unproven what portion of that sum, if any, is attributable

to DLA's negligence.  For example, Lyndon's engineering expert and Stephen Rogers, Lyndon's

on-site agent, offered comment to the effect that DLA could not have discovered all of Panther's

deficient work.  (Depo. of Joseph Asarisi, p. 47, Exh. F; Depo. of Steven Rogers, pp. 37-40, Exh.

H).   Further, Mr. Rogers acknowledged that DLA inspectors instructed Panther to make repairs,

but that when DLA inspectors left to observe another Panther crew, Panther ignored DLA's

instructions.  (Depo. of Steven Rogers, pp. 20-24, 48-49, Exh. H).  Consequently, not all of the

repair costs incurred by Lyndon can be attributable to DLA's alleged negligence.  Indeed,

Lyndon has offered no evidence of which repair costs are attributable to DLA's alleged

negligence.  Additionally, Lyndon alleges that Panther should have withheld some payment from

Panther for its deficient work, but no evidence has been offered by Lyndon quantifying this

injury.  Consideration for the degree or certainty of injury either favors DLA or is a neutral

factor.

       DLA's conduct is not closely connected to Lyndon's economic loss.  Lyndon alleges that

DLA failed to discover and force Panther to correct its deficient work and/or withhold payment

for the deficient work.  Continuing, Lyndon alleges that after Panther's default, if DLA had

properly exercised its duty of care, Lyndon would not have had to pay for the repair work that

Panther should have done; or Lyndon would have had access to the funds that should have been

withheld for Panther's deficient work.  Separating DLA from Lyndon by a wide gulf is Panther's

conduct, conveniently ignored by Lyndon.  Importantly, to prove that DLA failed to discover and

have Panther correct its deficiencies and/or to withhold payment, Lyndon must actually prove

that Panther's work was deficient.  Thus, Panther's negligence is a predicate to DLA's alleged

negligence.  More importantly, Lyndon could not have suffered economic loss had Panther not

defaulted on its contract with Hancock County.  Therefore, Panther's negligence was a necessary

predicate to any loss suffered by Lyndon.  Had Panther fulfilled its obligations, Lyndon could not

have suffered any loss.  Consequently, the lack of proximity between DLA's alleged conduct and

Lyndon's economic loss weighs in favor of DLA.

No moral blame is attached to DLA's conduct.  The concept of moral blame is at home in

the sphere of tort, but rests ill-at-ease in contract.  The present case involves no injury to life,

limb or property and is unaccompanied by any malice or reprehensible conduct.  The loss is

purely economic, allegedly deriving from the relationships and conduct of sophisticated business

entities.  The consideration of moral blame as a policy factor is indicative of the ill-fit when tort

encroaches upon contract.  Should there be moral blame, such rests more easily upon Panther and

Lyndon.  Panther defaulted on its obligations to Hancock County, requiring Lyndon to fulfill its

obligation under the performance bond.  Lyndon somehow thinks itself aggrieved for having to

assume the cost for which it was paid a premium by Panther.  Additionally, Lyndon clearly stood

in the best position to avoid any loss by adequately investigating and ultimately refusing to bond

Panther.  Lyndon now seeks to impose upon DLA a duty to foresee an unlikely result which

Lyndon itself could not foresee.  Any consideration of moral blame weighs in favor of DLA.

The policy of preventing future harm favors DLA.  Particularly, DLA's duty is defined

and imposed by its contracts with Hancock County, and any corresponding duty to Lyndon that

the Court might impose upon DLA would be governed by these same contracts.  <u>Bagwell</u>

9

Coatings, Inc. v. Middle South Energy, Inc., 797 F.2d 1298, 1310-11 (5th Cir. 1986); Mayor and City Council of Columbus, Mississippi v. Clark-Dietz and Associates-Engineers, Inc., 550 F. Supp. 610, 626-27 (N.D. Miss. 1982); State, for Use of Nat'l Surety Corp. V. Malvaney, 72 So. 2d 424, 431 (Miss. 1954).  Therefore, future conduct would be unchanged by imposing upon DLA a duty to Lyndon grounded in tort.  In fact, Lyndon stands in the best position to avoid future loss by adequately investigating the contractors it bonds.  It should not be forgotten that Lyndon assumed the risk of Panther's conduct and was paid a premium for the assumption. Additionally, refraining from expanding the scope of tort at the expense of contract would continue to allow parties to freely contract, negotiating, considering and assuming risks and liabilities as they may agree.  Certainly, Lyndon was aware of the contracts and provisions involved in the present case, yet Lyndon made an informed and market-driven decision to bond Panther, assuming the risk of Panther's conduct in exchange for remuneration.  Subrogation and contract provide Lyndon ample opportunity to seek redress and recovery.  Superimposing a tort duty over traditional concepts of contract offers no aid to the prevention of future harm in the present context.  The policy of preventing future harm weighs in favor of DLA.

The extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach favors DLA.  Based upon its contracts, DLA owes its ultimate duty to Hancock County as the owner.  If the Court places upon DLA a duty to Lyndon sounding in tort, particularly in which a contractor's default is deemed foreseeable, then DLA could easily be faced with future situations of conflicting duties.  Bagwell Coatings, 797 F.2d at 1312.  Notably, an engineer could be confronted by an owner pressing for completion of a project ahead of schedule in which the contractor is forced to delay contemporaneous repairs until the end of the project.  The engineer may have the authority to

10

halt work or withhold payment until the project is tested and repairs made, but such would clearly place him at odds with the owner.  If the engineer's duty is based on a contract with the owner, then the engineer clearly knows his bounds and may safely follow the owner's desire and direction.  However, if the engineer must also consider a duty in tort owed the contractor's surety, the engineer must consider the possibility that the contractor might default on the contract, requiring the surety to fulfill its performance bond and expose the engineer to suit for failure to force repairs or withhold payment.  The example above is but one of many potential pitfalls involving conflicting duties.  Opening the door to tort erodes the ability of commercial parties to freely contract, imposing uncertainty, negating the parties' intent and reducing faith and consistency in the agreement.

There are also consequences to the community at-large by imposing a tort duty upon an engineer in a contractual context.  Engineers are integral parts of modern civilization, developing and implementing designs and construction that satisfy society's basic structural needs, such as housing, to the most aesthetic architectural wonders and all things between.  If the profession of engineering becomes more onerous, fewer people will be attracted to the profession, or those already practicing will quit, and society will suffer.  The freedom to contract and the certainty of a negotiated agreement are interrupted and confounded by the imposition of duties sounding in tort.  It is elementary that when an engineer's potential exposure to liability increases so too does the cost of liability insurance which in turn increases the cost of doing business.  This is not a fanciful exposition but a real world concern in which DLA is currently ensnared.  Conversely, nothing is gained by imposing a duty in tort, except to provide the surety yet another avenue of potential recovery on a loss that it was paid to assume.  Clearly, the extent of the burden on DLA and the consequences to the community of imposing a duty in tort weighs in favor of DLA.

Finally, consideration for the availability, costs and prevalence of insurance for the risk involved favors DLA.  Certainly, liability insurance is available to DLA, for a price.  If engineers, and DLA in particular, are exposed to greater liability it is elementary that the cost of liability insurance will increase, as will the cost of doing business.  Notably, Lyndon as a bonding company is in the business of insuring against loss.  Moreover, it is re-insured in this matter by its agent, Cumberland.  Thus, insurance is also available to Lyndon to cover losses of the nature allegedly suffered by Lyndon in the instant matter.  Importantly, Lyndon stands in the best position to avoid such loss because it investigated, or should have investigated, Panther in the first instance.  Simply by bonding better contractors or not bonding questionable ones, Lyndon is able to reduce its risk of loss.  Additionally, Lyndon is paid a premium by contractors to assume the risk of default and subsequent loss.  Considerations for the availability, costs and prevalence of insurance for the risk involved weighs in DLA's favor.

A review of the policy factors reveals that each weigh against imposing a duty upon DLA to Lyndon sounding in tort.  Because these factors so overwhelmingly militate against imposing a tort duty upon DLA, the Court should grant DLA's Motion for Summary Judgment and dismiss the claims against it with prejudice.

2.    <u>Precedent</u>

In determining whether a duty should be imposed on DLA, this Court may also review any applicable precedent.  Because duty must be decided on a case-by-case basis, there is little binding precedent given the present context.  However, any examination of case law regarding the potential duty of an engineer to a surety in Mississippi should begin with <u>State, for Use of Nat'l Surety Corp. v. Malvaney</u>, 72 So. 2d 424 (Miss. 1954).

In <u>Malvaney</u>, the surety sued the architect under a negligence theory for wrongful release

12

of retainage funds, thereby depriving the surety of resort to the funds under the doctrine of equitable subrogation to the rights of the contractor to satisfy labor and material claims upon the contractor's default.  Malvaney, 72 So. 2d at 425-26.  The architect released retainage funds to the contractor even though the architect had not determined whether the contractor had satisfied all of his debts for labor and material associated with the project, which he had not.  Id. at 428-29.  Such release of retainage funds violated the architect's contract with the owner and deprived the surety of his subrogation to the rights of the contractor, particularly the retainage funds.  Id. at 430-31.

First, the court established that the surety's right to the retainage funds arose by virtue of the doctrine of equitable subrogation and that the retainage was for the mutual benefit of the owner and surety.  Id. at 429-430.  Second, the court found that the architect was charged with the knowledge of the surety's right of equitable subrogation by operation of statute and the "mutually interdepedent obligations and rights" contained in the contractual agreements among and between the owner, architect, contractor and surety.  Id. at 430-31.  Finally, the court found that the architect owed the surety a duty to avoid the loss to the surety occasioned by the wrongful release of the retainage funds.  Id. at 431.

This duty derived from "the general contractual arrangements which contained mutually interdependent rights and obligations" and from the architect assuming "the obligation to supervise the performance of the contract and to preserve the retainage funds to insure completion of the contract."  Id.  The court noted that this latter obligation, given the architect's actual or imputed knowledge, was "an act which, it as apparent, if negligently done would result in loss to the surety, and the law imposed upon him the duty to exercise due car to avoid such loss."  Id.  Clearly, the court imposed a duty in tort upon the architect to protect the surety's

equitable right of subrogation.  Consequently, the duty was predicated on a pre-existing right.

The <u>Malvaney</u> court recognized that the surety's right to equitable subrogation was threatened by the conduct of the architect, and allowed the surety to go forward on its negligence theory.  However, in finding for the surety, the court took an unwarranted activist approach in expanding the scope of tort at the expense of contract.  Tort was not, and need not have been, the preferred approach.  The doctrine of equitable subrogation and traditional surety law already provided the means by which the surety could be protected from the architect's negligence.  Particularly, the surety could have sued the owner for relief from its bond obligation, to the extent of the retainage amount, given the improper release of retainage funds by the architect.  <u>Argonaut Ins. Co. v. Town of Cloverdale, Indiana</u>, 699 F.2d 417, 419-20 (7th Cir. 1983).  Additionally, suit by the surety as a an alleged third-party beneficiary for breach of contract would have been more in keeping with the character of the facts and the relationship of the parties.   If such an approach had been followed or pointed out by the court, then the distinction between contract and tort should have been upheld.

In imposing a duty upon the architect sounding in tort, the <u>Malvaney</u> court did not rely on precedential case law, but allowed the duty to spring-forth fully formed in the decision.  To be fair, there is no evidence that the court was presented with arguments addressing the tort versus contract distinction, policy factors relative to duty, foreseeability considerations, the availability of traditional subrogation or contract remedies, such as suit as a third-party beneficiary, or the economic loss rule, which will be addressed herein, <u>infra</u> Part II.  To the court's credit, <u>Malvaney</u> is narrowly drawn and applies, if at all, only to situations involving the independent and preexisting right of equitable subrogation.  As alluded to by the court and as clarified in cited authority, the right of equitable subrogation applies only to retainage funds and not to progress

payments.  Malvaney, 72 So.2d at 430 (citing Jackson Lumber Co. v. Mosely, 11 So. 2d 199

(Miss. 1942); Canton Exchange Bank v. Yazoo County, 109 So. 1 (Miss. 1926); First Nat'l Bank

of Aberdeen v. Monroe County, 95 So. 726 (Miss. 1923).

Malvaney is easily distinguished from and inapplicable to the present case.  Particularly,

DLA directly addresses the tort versus contract distinction, considerations of duty and

foreseeabliltiy, the availability of potential contract remedies and the economic loss rule.

Additionally, the instant matter does not concern retainage funds, which were withheld and

turned over to Lyndon.  Further, Lyndon can assert no preexisting right at issue in this case.

Finally, Malvaney involved a situation in which the architect certified the project as substantially

complete and released the retainage funds without fulfilling his duty to the owner under the

contracts.  In the instant case, Panther defaulted, and DLA did not have occasion to have the

completed system tested and review and certify the final product.  Malvaney is neither

precedential nor persuasive.

For all its shortcomings, Malvaney is more logical, better articulated and more restrained

than the court's decision in U.R.S. Co., Inc. v. Gulffport-Biloxi Regional Airport Authority, 544

So. 2d 824 (Miss. 1989).  In U.R.S. the owner sued the architect, the contractor and the

contractor's surety for breach of contract regarding the construction of a defective airport-

terminal roof.  U.R.S., 544 So. 2d at 824.  The trial court found for the owner and further held

that the architect was liable for indemnity to the surety "for any funds [the surety] pays on the

judgment for the roof."  Id. at 825.  In upholding the judgment against the architect on the breach

of contract claim brought by the owner, the Mississippi Supreme Court examined the provisions

and duties contained in the contracts and found that the architect had breached its duties to the

owner.  Id. at 826-27.  The court found it particularly compelling that the architect had been

15

warned about the roof's deficiencies and that the architect admitted that it did not provide an adequate design or inspection.  Id. at 825.  Further, relying exclusively on Malvaney without providing any connecting rationale, the court upheld the trial court's finding that the architect should indemnify the surety for any funds paid on the judgment for the roof.  Id. at 828.

The court's finding in favor of the owner was based exclusively and properly on a breach of contract theory.  However, the court's rationale for upholding the architect's liability to indemnify the surety is far from clear.  If the court based its finding of indemnity on the imposition of a tort duty, then the court engaged in an activist and unprincipled determination unsupported by authority and logic, failing to address duty, forseeability, the tort versus contract distinction or the economic loss rule.

The court's discussion and quotation of Malvaney offers no guidance because Malvaney is completely inapposite to the facts cited in U.R.S.  From a review of the decision, it does not appear that the architect's liability to the surety is based on a wrongful release of retainage funds or on the surety's right to equitable subrogation.  Although the architect did certify the completed project when he knew the roof was deficient, there is no indication that the architect's liability to the surety was based on this fact.  Indeed, the opinion in U.R.S. does not clearly indicate whether the surety actually suffered loss, i.e., paid any funds to the owner.

Assuming that the owner did provide funds to replace the roof, the court's decision to uphold the architect's liability to the surety for indemnity only makes logical and legal sense if the court found that the architect's negligent breach of contract was the sole proximate cause of the owner's loss, such that the architect's failure to discover the obvious deficiencies in the roof construction was an intervening or superseding cause negating the contractor's failure to construct the roof in accordance with the contract plans and specifications.  See U.R.S., 544 So.

16

2d at 827 (finding that the roof was not constructed in compliance with the plans and specifications and that architect had knowledge of the deficiencies yet certified the work as approved).  The court's reasoning is simply opaque and unhelpful.

U.R.S. is particularly unhelpful in the present case.  The decision failed to address the derivation or rational imposition of duty, foreseeability, the necessary distinction between tort and contract, available breach of contract actions or the economic loss doctrine.  Assuredly, U.R.S. does not impose upon the architect a broad and sweeping duty to indemnify sureties when they suffer loss, especially where the surety's contractor is negligent or the efficient cause of the surety's loss.  Equally, U.R.S. involved a situation in which the architect certified the project as complete and acceptable with the full knowledge that the roof had not been constructed according to the plans and specification and was in fact defective.  Again, Panther defaulted, and DLA did not have occasion to have the completed system tested and review and certify the final product.  Clearly, U.R.S. is neither precedential nor persuasive.

There is simply no precedent establishing a common-law duty by an engineer to a surety sounding in tort.  Based on a consideration of the policy factors and lack of precedent, this Court should grant DLA's Motion for Summary Judgment.  However, should the Court find that the policy factors and precedent discussed herein warrant more serious consideration of the imposition of a duty upon DLA to Lyndon, there is precedent which requires that any imposition on an engineer of a duty to a third-party in a contractual context be based upon and governed by the contractual provisions.  Bagwell Coatings, Inc. v. Middle South Energy, Inc., 797 F.2d 1298, 1310-11 (5th Cir. 1986); Mayor and City Council of Columbus, Mississippi v. Clark-Dietz and Associates-Engineers, Inc., 550 F. Supp. 610, 626-27 (N.D. Miss. 1982); Malvaney, 72 So. 2d at 431.  Therefore, it is necessary for further examination to review relevant contract provisions.

In the Complaint, Lyndon relies on three provisions contained within the contracts to support its assertion that DLA owed Lyndon a duty.  First, Lyndon quotes from Section 14.7 of the General Conditions:

> 14.7   ENGINEER may refuse to recommend the whole or any part of any payment if, in ENGINEER's opinion, it would be incorrect to make such representations to OWNER.  ENGINEER may also refuse to recommend any such payment, or because of subsequently discovered evidence or the results of subsequent inspections or tests, nullify any such payment previously recommended, to such extent as may be necessary in ENGINEER's opinion to protect OWNER from loss because:
>
> > 14.7.1   the Work is *defective*, or completed Work has been damaged requiring correction or replacement,
> >
> > 14.7.2   the Contract Price has been reduced by Written Amendment or Change Order
> >
> > 14.7.3   OWNER has been required to correct *defective* Work or complete Work in accordance with paragraph 13.14, or
> >
> > 14.7.4   of ENGINEER's actual knowledge of the occurrence of any of the events enumerated in paragraphs 15.2.1 through 15.2.9 inclusive.

(Complaint, pp. 2-3, ¶ 10, Exh. A).  Without doubt, there is no mention of any duty being owed by DLA as the engineer to Lyndon as the surety.  In fact Lyndon is not mentioned at all.  Additionally, no mention is made of Panther, the contractor and Lyndon's insured.  Pointedly, duty is not discussed in Section 14.7.  A plain reading of the provision reveals that while DLA is granted certain *authority*, DLA is not obligated under any imposition of duty.

The case of Hartford Steam Boiler Inspection and Ins. Co. v. Cooper, 341 So. 2d 665 (Miss. 1977), illustrates the point above.  In Cooper, Hartford insured Sanderson Farms, Inc. against costs of repairs to equipment and shutdown losses from breakdowns of machinery.

Cooper, 341 So. 2d at 666.  The court noted that "the policy provided that Hartford had the right (but was not required) to make inspections of the insured equipment and could under certain circumstances suspend insurance coverage."  Id.  After an employee was injured at Sanderson Farms when a large amount of ammonia was released from a machine he was operating, the employee brought suit against Hartford alleging that Hartford had a duty to inspect the machinery, that Sanderson and its employees relied on these inspections and that Hartford was negligent in its inspections.  Id. at 666-67.  The court rejected the plaintiff's claims and held that:

> The provision of the policy giving Hartford the right to inspect is *permissive*. There is *no obligation* to make inspections and the proof shows that such inspections as Mason made were for the purpose of reducing the risk of loss that Hartford might have under the policy. The incidental benefits that accrued to Sanderson's employees and the public by Mason's inspections and recommendations should not rationally give rise to liability for failure to inspect a particular piece of equipment.

Id. at 667 (emphasis added).  The rationale in Cooper is equally applicable to the present case. Permissive language doe not give rise to an obligation or duty.

Next, Lyndon's Complaint quotes from Section 14.5 of the General Conditions:

> *Review of Applications for Progress Payments:* ENGINEER's recommendation of any payment requested in an Application for Payment will constitute a representation by ENGINEER to OWNER, based on ENGINEER's on-site observations of the Work in progress as an experienced and qualified design professional and ENGINEER's review of the Application for Payment and the accompanying data and schedules that the work has progressed to the point indicated; that, to the best of ENGINEER's knowledge, information and belief, the quality of the Work is in accordance with the Contract Documents . . . and the CONTRACTOR is entitled to payment of the amount recommended.

(Complaint, p. 3, ¶ 12, Exh. A).  Notably absent from this provision is any mention of an obligation or duty that DLA owes to Lyndon.  The provision addresses the process and circumstances under which DLA recommends payment to Hancock County for work performed by Panther, and what such recommendation means.  This provision imposes no duty on DLA to

19

Lyndon.

Further, Lyndon's quotation from Section 14.5 conveniently omits important portions of the section.  First, Lyndon omits the parenthetical statement replaced by an ellipsis in its quotation of Section 14.5.  The entire phrase states as follows:

> that to the best of the ENGINEER's knowledge, information and belief, the quality of the Work is in accordance with the Contract Documents (*subject to an evaluation of the Work as a functioning whole prior to or upon Substantial Completion,* to the results of any subsequent test called for in the Contract Documents, to a final determination of quantities and classifications for Unit Price Work under paragraph 9.10, and to any other qualifications stated in the recommendation); and that CONTRACTOR is entitled to payment of the amount recommended.

(General Conditions, p. 27, § 14.5, Exh. C). (emphasis added).  The provision clearly qualifies the foundation for DLA's knowledge.  Particularly, DLA could not know the true quality and extent of Panther's work until the project could be tested and evaluated as a functioning whole. DLA never got that opportunity because of Panther's default.

Section 14.5 continues by stating:

> However, by recommending nay such payment ENGINEER will not thereby be deemed to have represented that exhaustive or continuous on-site inspections have been made to check the quality or the quantity of the Work beyond the responsibilities specifically assigned to ENGINEER in the Contract Documents. . .

(General Conditions, p. 27, § 14.5, Exh. C).  DLA was not required by the Contract Documents to make exhaustive or continuous on-site inspections.  In the absence of such an undertaking, courts have held that the engineer is not responsible for supervising the construction and quality of the contractor's work.  Clark-Dietz, 550 F. Supp. at 627.  If no such duty is owed to either the owner or the contractor, DLA assuredly did not owe such duty to Lyndon.

Finally, citing DLA's Agreement for Engineering Services with Hancock County, Lyndon states in its Complaint that DLA as engineer would "interpret the intent of the drawings and

specifications to protect the OWNER against defects and deficiencies in construction on the part

of the contractors" and would "provide general engineering review of the work of the contractors

as construction progresses to ascertain that the contractor is conforming with the design

concept." (Complaint, pp. 3-4, ¶ 13, Exh. A). Again, no obligations or duties are owing by DLA

toward Lyndon per the contract terms. Additionally, as noted previously, DLA was not required

to provide continuous and exhaustive on-site inspections regarding the quality or quantity of the

contractor's work.

The contract provisions cited by Lyndon do not impose or give rise to any duty by DLA

owing to Lyndon. Further, specific contract provisions, discussed below, make it abundantly

clear that DLA did not warrant or guarantee the quality or quantify of Panther's work and that

DLA did not assume any duty or liability to Lyndon. Specifically, DLA owed no duty to

Lyndon to require Panther to correct its deficient work or to withhold payment for the deficient

work. Indeed, DLA did not owe anyone a duty to *require* Panther to complete its deficient work

or to withhold payment for deficient work, prior to certification of the project as substantially

complete.

Several relevant contract provisions clearly reveal DLA's absence of duty to Lyndon. In

construing a contract, or related contracts, the instrument as a whole will be looked to and its

meaning determined for the entire agreement as written in order to ascertain the intentions of the

parties from the contract. Mitchell v. Eagle Motor Lines, 87 So. 2d 466, 469 (Miss. 1956).

Additionally, it is a fundamental tenet of contract law that parties may limit their liability or

rights between themselves or as to third-parties that may benefit from the contract. E.C. Ernst,

Inc. v. Manhatten Constr. Co., 551 F.2d 1026, 1030-1031 (5th Cir. 1977); Heber E. Costello, Inc.

v. Edwards and Son, Inc., No. 2:96CV42-B-B, 1998 WL 94925 at *4 (N.D. Miss. Jan. 22, 1998).

Beginning with the Standard Form of Agreement Between Owner and Engineer for Professional Services ("Standard Form Agreement") during the construction phase, DLA agreed to make periodic visits and observation of the construction site to "endeavor to determine *in general* if such work is proceeding in accordance with the Contract Documents and ENGINEER shall keep OWNER informed of the progress of the work."  (Standard Form Agreement, p. 3, § 1.6.2.1, Exh. D).  Clearly, DLA obligated itself to Hancock County for certain general undertakings, but no obligations are undertaken on Lyndon's behalf.

Further, Section 1.6.2.3 of the Standard Form Agreement is particularly relevant and states in pertinent part:

> ENGINEER shall not, during such visits or as a result of such observations of Contractor(s)' work in progress, supervise, direct or have control over Contractor(s)' work nor shall ENGINEER have authority over or responsibililty for the means, methods, thechniques, sequences or procedures of construction selected by Contractor(s) . . . .  Accordingly, ENGINEER can neither guarantee the performance of the construction contracts by Contractor(s) nor assume responsibility for Contractor(s)' failure to furnish and perform their work in accordance wit the Contract Documents.

(Standard Form Agreement, p. 3-4, § 1.6.2.3, Exh. D).  Clearly, DLA is not responsible for Panther's work or how it went about its work, including any deficient work or its default. Consequently, DLA owed Lyndon no duty to require Panther to repair its work or withhold payment for deficient work, prior to Panther's default.  Additionally, Lyndon appears to complain primarily of the way Panther performed, and would have had DLA institute different procedures. DLA, however, possessed no such authority and regardless, owed no duty to Lyndon to exercise any permissive authority.

Additionally, Section 1.6.9.2 of the Standard Form Agreement states in pertinent part that:

> By recommending any payment ENGINEER will not thereby be deemed to have represented that exhaustive, continuous or detailed reviews or examinations have been made by ENGINEER to check the quality or quantity of Contractor(s) work .
> . . .

(Standard Form Agreement, pp. 4-5, § 1.6.9.2, Exh. D).  As noted previously and as evident from the contracts, DLA was not required by to make exhaustive or continuous on-site inspections or to guaranty Panther's work.  In the absence of such an undertaking, courts have held that the engineer is not responsible for supervising the construction and quality of the contractor's work.  <u>Clark-Dietz</u>, 550 F. Supp. at 627.  If no such duty is owed to either the owner or the contractor, DLA assuredly did not owe such duty to Lyndon.

The Standard Form Agreement also explicitly limits DLA's responsibilities, liabilities and rights of other parties.  Section 1.6.12 states in pertinent part that:

> ENGINEER shall not be responsible for the acts or omissions of any Contractor, or of any subcontractor or supplier, or any of the Contractor(s)' or subcontractor's or supplier's agents or employees or any other person . . . at the site or otherwise furnishing or performing any of the Contractor(s)' work . . . .

(Standard Form Agreement, p. 5, § 1.6.12, Exh. D).  More importantly, Section 7.5.3 unequivocally states that:

> Nothing under this Agreement shall be construed to give any rights or benefits in this Agreement to anyone other than OWNER and ENGINEER, and all duties and responsibilities undertaken pursuant to this Agreement will be for the sole and exclusive benefit of OWNER and ENGINEER and not for the benefit of any other party.

(Standard Form Agreement, p. 16, § 7.5.3, Exh. D).  In accordance with established contract principles, DLA and Hancock County plainly limited the duties, responsibilities, rights and benefits between themselves and other parties, including Lyndon.

The Standard General Conditions of the Construction Contract ("General Conditions") contain near identical provisions as those noted above, as well as some further limitations

regarding rights and duties of DLA to other parties.  Particularly, Section 3.2 of the General

Conditions states in pertinent part:

> However, no provision of any referenced standard specification, manual or code (whether or not specifically incorporated by reference in the Contract Documents) shall be effective to change the duties and responsibilities of OWNER, CONTRACTOR or ENGINEER, or any of their consultants, agents or employees from those set forth in the Contract Documents, nor shall it be effective to assign to ENGINEER, or any of ENGINEER's consultants, agents or employees, any duty or authority to supervise or direct the furnishing or performance of the Work or any duty or authority to undertake responsibility contrary to the provisions of paragraph 9.15 or 9.16.

(General Conditions, p. 9, § 3.2, Exh. C).  More pointedly, Section 9.13 of the General

Conditions place further limitations on the DLA's responsibilities as follows:

> Neither ENGINEER's *authority to act* under this Article 9 or elsewhere in the Contract Documents nor any decision made by ENGINEER in good faith either *to exercise or not exercise such authority* shall give rise to any duty or responsibility of ENGINEER to CONTRACTOR, any Sub-contractor, any Supplier, or any other person or organization performing any of the Work, or to any *surety* for any of them.

(General Conditions, p. 20, § 9.13, Exh. C).  The limitations of Section 9.13 go directly and

quickly to the heart of Lyndon's claims against DLA.  Lyndon claims that DLA should have

required Panther to correct deficient work or withheld payment therefore.  Reflecting what the

courts have already stated, see supra, at 16-17, Section 9.13 specifically excludes the exercising

or not exercising of DLA's authority from giving rise to a duty owed to Lyndon.  Simply put,

having the power to exercise authority does not create a duty or obligation to exercise it.  See

supra, at 16-17.

After lengthy analysis of policy factors, precedent and the contract documents, it is

abundantly clear that DLA does not owe a duty to Lyndon, and Lyndon cannot prove otherwise.

Particularly, DLA did not owe Lyndon a duty to require Panther to correct its deficient work or

to withhold payment for deficient work prior to Panther's default.  Consequently, the Court

should grant DLA's Motion for Summary Judgment.

       B.     <u>Breach of Duty</u>

Should the Court find that DLA owed Lyndon a duty, which is sharply disputed, Lyndon cannot prove that DLA breached a duty to Lyndon.  For there to be a breach of duty by DLA to Lyndon there must be a breach of duty by DLA to Hancock County as the owner.  <u>Bagwell Coatings, Inc. v. Middle-South Energy, Inc.</u>, 797 F.2d 1298, 1310 (5th Cir. 1986).  Lyndon can offer no proof that DLA breached any duty to the Hancock County.  In fact, DLA fulfilled its obligation to Hancock County by delivering a complete and functioning low pressure sewer system.

Further, Lyndon must offer proof that DLA failed to exercise ordinary care by failing to uncover Panther's deficient work and to require Panther to correct its deficient work or withhold payment therefore.  Lyndon relies on the fact that deficient work was discovered during testing of the project.  Particularly, Lyndon claims that based on the number of deficiencies that were uncovered, DLA must have breached its duty of administration and inspection.  However, the simple presence of deficiencies, regardless of the number, does not give rise to a breach of duty.  Such an approach more closely resembles negligence <u>per</u> <u>se</u> or <u>res</u> <u>ipsa</u> <u>loquitur</u>, neither of which is applicable to the instant case.

Additionally, there is no evidence presented that DLA breached its duty to Hancock County by not requiring Panther to correct its deficient work.  Lyndon's problem here is temporal.  DLA was not able to test Panther's work prior to its default.  Had Panther's work been tested, the deficiencies would have been discovered, and Panther would have been forced to correct them.  However, Lyndon, in hindsight, now asserts that DLA should have required Panther to correct its deficient work as the project progressed.  Lyndon cannot offer proof,

however, that waiting until the end of a project to correct deficient work is unreasonable or a breach of duty to Hancock County.

Finally, Lyndon cannot offer proof that DLA breached its duty to Hancock County by failing to withhold a portion of the progress payments.  Further, Lyndon cannot offer proof that it was unreasonable for DLA to rely on the 10% retainage to test and correct any deficiencies in Panther's work.  Lyndon's allegations of breach of duty are based on conjecture, speculation and hindsight, none of which is sufficient proof of breach of duty.  Additionally, managerial decisions may not rise to the level of breach of contract, even though a third-party may be adversely impacted.  <u>Bagwell Coatings</u>, 797 F. 2d at 1312.  DLA's decision when or whether to require Panther to repair its deficient work or whether to withhold payment therefore is clearly a managerial or administrative decision.  Consequently, the Court should grant DLA's Motion for Summary Judgment.

C.     <u>Proximate Cause</u>

Lyndon must offer evidence that DLA's acts or omissions proximately caused Lyndon's economic loss.  In proving proximate cause, a plaintiff must prove both cause in fact and foreseeablity.  <u>Patterson v. Liberty Assocs.</u>, No. 2003-CA-01167-SCT, 2004 WL 2823078, at *4 (Miss. Dec. 9, 2004).  Thus, the alleged negligent act must have actually caused the harm and without which the injury was not possible, sometimes referred to as "but-for" causation.  <u>See Palomo v. U.S.</u>, No. 1:96cv329, 2000 WL 33935645 at *10 (S.D. Miss. May 31, 2000). Proximate cause of an injury is that cause which in natural and continuous sequence unbroken by any efficient intervening cause produces the injury and without which the result would not have occurred."  <u>Delahoussaye v. Mary Mahoney's, Inc.</u>, 783 So. 2d 666, 671 (Miss. 2001).

Clearly, Panther's negligent conduct, particularly its default, was the cause in fact of

Lyndon's injury.  In fact, Lyndon could not sustain economic loss without Panther defaulting, requiring Lyndon to perform under its bond.  Thus, "but for" Panther's default, Lyndon could not have sustained loss.  Panther's default is the only efficient cause of Lyndon's loss.  Simply put, without Panther's default Lyndon absolutely could not have been injured.  As comparison, even with DLA exercising ordinary skill and diligence, some deficiencies would have gone unnoticed and uncorrected until the end.  Given Panther's default, Lyndon would still have been financially responsible for correcting those deficiencies, thus Panther's default was the cause in fact of Lyndon's loss.  Accordingly, the Court should grant DLA's Motion for Summary Judgment.

Regarding foresseability, such was discussed at length in Part I, A, <u>supra</u>, and DLA would rely on those arguments which clearly prove that it was not reasonably foreseeable that DLA's conduct would cause Lyndon loss.  Consequently, the Court should grant DLA's Motion for Summary Judgment.

  D. <u>Damages</u>

See generally discussion on pages 8-9.  Additionally, Lyndon must prove loss not only to itself but also to Hancock County as the project owner.  <u>See</u> <u>Bagwell Coatings</u>, 797 F.2d at 1312 (finding no substantial evidence that any act of contract administrator caused any ultimate harm to owner).  Lyndon can offer no proof that Hancock County was injured by any act or omission of DLA, and no such fact is alleged in the pleadings or responses to discovery.  There simply was no injury to Hancock County caused by DLA's alleged acts or omissions because DLA fulfilled all its obligations to the owner.  Consequently, the Court should grant DLA's Motion for Summary Judgment.

  II. <u>ECONOMIC LOSS RULE</u>

Lyndon's negligence claim is barred by the economic loss rule because its alleged

damages are solely economic and arise from the duties and obligations, if any, provided in the

network of agreements between the parties of which all parties were signatories and/or had

notice.  Essentially, the economic loss rule holds that there can be no recovery in tort for

economic damages.  East Mississippi Elec. Power Ass'n v. Porcelain Products Co., 729 F. Supp.

512, 517 (S.D. Miss. 1990).  The economic loss rule is necessary to preserve the integrity of

contracts and to protect contract law from encroachment by tort law.  Id. at 516 (if tort claims

"were allowed to progress too far, contract law would drown in a sea of tort").  While Mississippi

has applied the economic loss rule in the context of products liability litigation, see State Farm

Mutual Automobile Ins. Co. v. Ford Motor Co., 736 So. 2d 384 (Miss. Ct. App. 1999), the rule

has been cited for the general proposition that the integrity of contracts must be protected.

Bayvue Properties of Punta Gorda, Ltd. v. Unicorn Int'l, Inc., 1995 WL 1945498 (N.D. Miss.

1995).  Additionally, nothing in the application of the economic loss rule by Mississippi courts

negates or prohibits the application, or the necessity, of the rule in the instant case.

A case on all fours is BRW, Inc. v. Dufficy & Sons, Inc., 99 P.3d 55 (Colo. 2004).  In

BRW, a steel subcontractor on a public works project brought an action for negligence against

the engineering firm and inspector on the grounds that improper plans and inspection caused cost

overruns.  Specifically, the City of Denver contracted with BRW to obtain professional services

for the design and construction administration of the Speer Boulevard Bridges.  Id. at 68.

The BRW contract set out its standard of care and duties, and BRW agreed to complete

all work performed under the BRW contract in "accordance with the standards of care, skill and

diligence provided by competent professionals who perform work or services of a similar

nature."  BRW also agreed to inspect the performance of the contract to determine that the work

28

"has been or is being installed in conformance with the Contract Documents." Id.

As required by the BRW contract, BRW completed the drawings and specifications for the Project.  Subsequently, the City invited bids from general contractors.  Edward Kraemer & Sons, Inc. ("Kraemer") was the successful bidder and entered into a contract with the City providing that Kraemer would serve as the general contractor for the Project.  Id.

Kraemer then subcontracted with Anko Metal Services, Inc. ("Anko") for the fabrication, painting and shipment of structural steel.  In turn, Anko subcontracted with Dufficy for the fabrication, painting, and shipments of portions of the structural steel.  Dufficy subcontracted with Coblaco Services, Inc. to apply the topcoat and primer and with Sherwin-Williams to supply paint products for the Project.  BRW contracted with PSI to inspect all of the work at issue.  Id.

Kraemer and all of its subcontractors, including Dufficy, were contractually obligated to build the Project in accordance with BRW's design drawings and specifications.  For example, Dufficy's contract with Anko required Dufficy to fabricate, paint, and ship structural steel for the Project, in accordance with BRW's plans and specifications.  Likewise, the contract between Kraemer and the City incorporated BRW's plans and specifications.  The Project incurred unexpected delays due to application of the primer and top-coat and the cure period.  Id. at 69.

In its Complaint, Dufficy alleged that BRW failed to exercise reasonable care when: (1) preparing design drawings and specifications for the Project involving the paint system; (2) investigating whether requiring implementation of the paint system was justified; and (3) administering the contract documents.  Dufficy also asserted a negligence claim against PSI alleging that PSI failed to exercise reasonable care when inspecting the Project.  Dufficy sought only economic damages for these claims.

29

The Colorado Supreme Court explained history and rationale of the economic loss rule as follows:

> We addressed Colorado's economic loss rule in <u>Town of Alma</u>. In that case, the town and AZCO construction had a contract for services that provided that AZCO would guarantee all materials, equipment, and the quality of the work performed. <u>Town of Alma</u>, 10 P.3d at 1258. When the water system began to leak, the town sued AZCO for damages under a negligence theory. We concluded that the contract assigned a duty of care to AZCO to perform the work and no independent duty of care existed to support the negligence claim.
>
> We stated the economic loss rule as follows: "a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law." <u>Town of Alma</u>, 10 P.3d at 1264. When we adopted this rule, we thoroughly examined the origins and purposes of the economic loss rule in light of contract and tort law. The essential difference between a tort obligation and a contract obligation is the source of the parties' duties. <u>Id.</u> at 1262. Contract obligations arise from promises the parties have made to each other, while tort obligations generally arise from duties imposed by law to protect citizens from risk of physical harm or damage to their personal property. <u>Id.</u> "Contract law is intended to enforce the expectancy interests created by the parties' promises so that they can allocate risks and costs during their bargaining." <u>Id.</u>
>
> <u>Town of Alma</u> applied the economic loss rule to parties in a direct two-party contract. Here, Dufficy does not have a direct two-party contract with BRW or PSI. Dufficy argues that the application of the economic loss rule is limited to cases where the parties contracted directly with each other for their rights and obligations. Dufficy claims that it did not have an "opportunity . . . to bargain directly with PSI and BRW over the risk of the harm which would result from defective specifications and negligent project administration." We disagree and hold that the economic loss rule applies when the claimant seeks to remedy only an economic loss that arises from interrelated contracts.
>
> The economic loss rule applies between and among commercial parties for three main policy reasons, none of which depends upon or is limited to the existence of a two-party contract: (1) to maintain a distinction between contract and tort law; (2) to enforce expectancy interests of the parties so that they can reliably allocate risks and costs during their bargaining; and (3) to encourage the parties to build the cost considerations into the contract because they will not be able to recover economic damages in tort. <u>Town of Alma</u>, 10 P.3d at 1262, 1264. <u>See</u> <u>Daanen & Janssen, Inc. v. Cedarapids, Inc.</u>, 216 Wis.2d 395, 573 N.W.2d 842, 846 (1998) (concluding that lack of a direct two-party contract does not affect these policies with respect to

commercial parties).

In the context of larger construction projects, multiple parties are often involved. These parties typically rely on a network of contracts to allocate their risks, duties, and remedies:

> [C]onstruction projects are multi-party transactions, but rarely is it the case that all or most of the parties involved in the project will be parties to the same document or documents.   In fact, most construction transactions are documented in a series of two-party contracts, such as owner/architect, owner/contractor, and contractor/subcontractor.    Nevertheless, the conduct of most construction projects contemplates a complex set of interrelationships, and respective rights and obligations . . . .

Fundamentals of Construction Law 4-5 (Carina Y. Enhada et al., eds., 2001).

In such a contract chain, the parties do have the opportunity to bargain and define their rights and remedies, or to decline to enter into the contractual relationship if they are not satisfied with it.  Even though a subcontractor may not have the opportunity to directly negotiate with the engineer or architect, it has the opportunity to allocate the risks of following specified design plans when it enters into a contract with a party involved in the network of contracts. In this situation, application of the economic loss rule encourages a subcontractor to protect itself from risks, holds the parties to the terms of their bargain, enforces their expectancy interests, and maintains the boundary between contract and tort law.

The policies underlying the application of the economic loss rule to commercial parties are unaffected by the absence of a one-to-one contract relationship. Contractual duties arise just as surely from networks of interrelated contracts as from two-party agreements.  While this conclusion is a natural progression from our holdings in Town of Alma and Grynberg v. Agri Tech, Inc., 10 P.3d 1267 (Colo.2000), it is illustrative to consider the reasoning and conclusion in a Wyoming case with facts similar to those presented here.

In Rissler & McMurry Co. v. Sheridan Area Water Supply Joint Powers Bd., 929 P.2d 1228 (Wyo.1996), the owner of a water project contracted with HKM for the design and preparation of site plans.  Rissler submitted a bid to construct the project and was awarded the bid. Shortly after the project began, Rissler encountered problems and believed that HKM's specifications were faulty.  Rissler requested that HKM modify the plans, but HKM refused. Rissler brought negligence and negligent misrepresentation claims against HKM. The Wyoming court held that the economic loss rule barred these tort claims, even though there was no contract directly between

HKM and Rissler.

The court explained:

> In this case, Rissler did not contract with HKM for the design of the Project and therefore had no opportunity to negotiate directly with HKM regarding the limits of its liability. However, Rissler had the opportunity to allocate the risks associated with the costs of the work when it contracted with the [owner]. . . .

Id. at 1235.

In finding that the economic loss rule barred Dufficy's negligence claim against BRW, the

court held as follows:

> If we conclude that the duty of care owed by BRW and PSI was memorialized in the contracts, it follows that the plaintiff has not shown any duty independent of the interrelated contracts and the economic loss rule bars the tort claim and holds the parties to the contracts' terms. See Grynberg, 10 P.3d at 1270; Berschauer/Phillips Constr. Co. v. Seattle School Dist. No. 1, 124 Wash.2d 816, 881 P.2d 986, 992 (1994) (explaining that, "[t]he construction industry ... would suffer [if tort and contract remedies were allowed to overlap], for it is in this industry that we see most clearly the importance of the precise allocation of risk as secured by contract").

> The interrelated contracts in this case contain BRW's and PSI's duty of care, and Dufficy's remedies exist in contract. Dufficy's tort claims are based on duties contained in these contracts. In Dufficy's negligence claim against BRW, Dufficy asserts that BRW owed Dufficy "a professional duty to exercise reasonable care, including, but not limited to, preparing design drawings and specifications that were suitable for construction of the Project." Dufficy alleges that BRW breached this duty of care; thus, it is entitled to recover money damages under tort law.

> However, the BRW contract itself required BRW to meet this standard of care. The BRW contract provides that the drawings and specifications prepared by BRW "must represent a thorough study and competent solution for the Project as per usual and customary professional standards and shall reflect all architectural and engineering skills applicable to that phase of the Project." The contract also states that the plans and specifications "shall be adequate and sufficient for the proper construction of the Project." Thus, the contract contains the duty BRW allegedly breached.

> Similarly, Dufficy asserted a negligence claim against PSI. Dufficy's amended complaint against PSI states that "PSI did not exercise reasonable care when inspecting paint applications on the Project[,]" but such a duty is contained in the

contracts.  The BRW contract required BRW to inspect for compliance with the plans and specifications "as is necessary to determine that the work has been or is being installed in conformance with the Contract Documents."  BRW had to perform this service "in accordance with the standards of care, skill and diligence provided by competent professionals who perform work . . . of a similar nature." BRW contracted with PSI to perform these inspection duties.  The contract between BRW and PSI imposed a duty on PSI to perform its obligations with care and in a non-negligent manner. Thus, Dufficy's negligence claim against PSI is rooted in BRW's contractual obligation to inspect for compliance with the Project and PSI's contractual obligation to carry out this duty.

Accordingly, the economic loss rule bars the plaintiff's negligence claim.  <u>Town of Alma</u> focused on the fact that the duty allegedly breached was contained in the contract.  Here, the duties allegedly breached were contained in the network of interrelated contracts, and the economic loss rule applies.

<u>Id.</u> at 74.

Just like the parties in the instant case (i.e., Hancock County, Panther, DLA and Lyndon), in <u>BRW</u>, the Colorado Supreme Court recognized that the "contractual duties . . .  arose out of a network of agreements of which all parties had notice.  The Project involved commercially sophisticated parties able to negotiate and bargain for an allocation of risks, duties, and remedies." <u>Id.</u> at 73.  Prior to issuing its performance bond, Lyndon received all of the relevant contract documents, including but not limited to, the Standard Form of Agreement Between Owner and Engineer for Professional Services and Standard General Conditions of the Construction Contract, including all of their terms and provisions.  In fact, Lyndon issued its performance bond based on all of the interrelated contract documents for Project North and negotiated an indemnity agreement with Panther in light of the contract documents, the nature and scope of Project North and an evaluation of Panther's work history and financial position. Further, Lyndon received financial remuneration in the form of a premium for issuing the performance bond for Project North.  Simply put, Lyndon had the opportunity to, and, in fact,

33

bargained for and defined its rights and remedies with regard to Project North.  If Lyndon was not satisfied with the terms and provisions of the interrelated contract documents, it could have declined to enter into the contractual chain.

Pursuant to the teachings of <u>BRW</u>, this Court should grant DLA's Motion for Summary Judgment and dismiss Lyndon's negligence claim as barred by the economic loss doctrine.

<u>CONCLUSION</u>

Based on the reasons contained herein, DLA requests that the Court GRANT its Motion for Summary Judgment and dismiss the claims against it with prejudice.

RESPECTFULLY SUBMITTED, this the 29th day of April, 2005.

DUKE LEVY & ASSOCIATES, P.A.

BY: SAMSON & POWERS, PLLC

BY:   *s/ROLAND F. SAMSON, III*
        Mississippi Bar No. 8764
        SHAWN S. SHURDEN
        Mississippi Bar No. 99678

<u>CERTIFICATE OF SERVICE</u>

I, ROLAND F. SAMSON, III, of the law firm of Samson & Powers, PLLC, do hereby certify that I have this day electronically filed the foregoing with the Clerk of Court using the ECF system, which sent notification of such filing to the following: Thomas C. Anderson, Esq.
        THIS, the 29th day of April, 2005.

*s/ROLAND F. SAMSON, III*
MS BAR NO. 8764

SAMSON & POWERS, PLLC
Attorneys at Law
2408 - 14th Street
Post Office Box 1417
Gulfport, Mississippi 39502-1417
Telephone: 228/822-1109
Facsimile: 228/822-2317